**SARAH HEATON CONCANNON**
**(SDNY Bar No. SC-9111)**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, N.E.**
**Washington, D.C. 20549**
**(202) 551-5361**
**ConcannonS@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BTIG, LLC**<br><br>**Defendant.** | **No. 21 Civ. 4521**<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded**<br><br>**ECF CASE** |

Plaintiff, the Securities and Exchange Commission ("SEC"), for its Complaint against Defendant BTIG, LLC ("BTIG" or "Defendant"), alleges as follows:

## SUMMARY

1. This action concerns the misconduct of registered broker-dealer, BTIG, which repeatedly violated the order marking and locate requirements of Rules 200(g) and 203(b)(1) of Regulation SHO [17 C.F.R. §§ 242.200(g), 242.203(b)(1)] under the Securities Exchange Act of 1934 ("Exchange Act"). Regulation SHO regulates the short selling of securities and was designed, in part, to restrict naked short selling and to reduce failures to deliver. "Naked short selling" is the unlawful practice of short selling shares that have not been borrowed or located. If sellers are engaged in naked short selling, then the volume of stock sold may be larger than the

tradeable shares in the market, and can lead to "failures to deliver," which occur when a seller fails to deliver securities that it has sold by the settlement date.

2. Rule 200(g) of Regulation SHO requires broker-dealers to mark all sale orders of equity securities as "long," "short," or "short exempt." A sale order may be marked as "long" only if the seller is "deemed to own" the security being sold and: (i) the security to be delivered is in the physical possession or control of the broker; or (ii) it is reasonably expected that the security will be in the physical possession or control of the broker-dealer no later than the settlement date. Under certain circumstances, discussed below in paragraphs 42 through 45, an order may be marked "short exempt" if the seller is "deemed to own" the security, "provided that the person intends to deliver the security as soon as all restrictions on delivery have been removed." 17 C.F.R. § 242.200(g)(2). An order must be marked "short" if it is neither long nor short exempt.

3. Rule 203(b)(1) of Regulation SHO—often referred to as the "locate" requirement—generally prohibits broker-dealers from either accepting a short sale order or effecting a short sale for their own account, unless the broker-dealer has borrowed the security, entered into a bona fide arrangement to borrow the security, or has reasonable grounds to believe that the security can be borrowed so that the security can be delivered on the date delivery is due. 17 C.F.R. § 242.203(b)(1).

4. From December 2016 through July 2017 (the "Relevant Period"), BTIG mismarked as "long" or "short exempt" ***over 90*** sale orders from a single hedge fund customer (the "Hedge Fund")—totaling more than ***$250 million*** in sale orders and comprising nearly 160 million shares of stock—in violation of Rule 200(g) of Regulation SHO. BTIG's customer was not deemed to own the shares of stock sold, because the Hedge Fund: (i) did not have title to the

stock; (ii) had not purchased or entered into an unconditional contract binding on both parties thereto to purchase the stock; (iii) did not own a security convertible into the stock that it had tendered for conversion; and (iv) did not have a net long position in the stock. BTIG's customer was, therefore, "short," and BTIG should have correctly marked its customer's sale orders as "short."

5. BTIG also did not have the shares of stock that the Hedge Fund sold in its possession or control and did not reasonably expect to receive those shares by the settlement date. Accordingly, BTIG should have marked its customer's sale orders as "short" on this additional, independent ground.

6. On each of these over 90 occasions, BTIG also failed to borrow and locate shares before executing these effective short sales, in violation of Rule 203(b)(1) of Regulation SHO.

7. As a broker-dealer registered with the SEC, BTIG had independent gatekeeper responsibilities under the federal securities laws to ensure that the orders it executed were correctly marked. BTIG was not entitled to simply rely on its customer's representations concerning order marking. Rather, BTIG was obligated to independently verify that its customer was, in fact, long, before marking the trades.

8. BTIG failed to verify that the Hedge Fund was deemed to own the shares of stock sold. BTIG did not have the shares of stock sold in its physical possession or control at the time it marked the sale orders, and BTIG did not reasonably expect that the shares of stock would be in its possession or control by the settlement date.

9. Throughout the Relevant Period, BTIG ignored red flags indicating that the Hedge Fund was making false representations concerning its ownership of securities, which led to BTIG's improperly marking the sale orders as "long" and "short exempt." BTIG was aware

of the Hedge Fund's repeated failures to deliver stock for timely settlement. Despite this and other red flags, BTIG continued to improperly mark the Hedge Fund's sales as "long" and "short exempt," without determining that the Hedge Fund was deemed to own the securities sold and that BTIG's order markings were correct. They were not.

10. Through its violations of Rules 200(g) and 203(b)(1) of Regulation SHO, BTIG benefited its customer in several ways: (i) the Hedge Fund did not have to incur the expense of borrowing or locating shares of stock sold, which were costly and difficult to borrow at the time; (ii) BTIG was able to complete sales on behalf of its customer that otherwise would have been prohibited by a market regulation device; and (iii) the Hedge Fund effectively got two extra trading days to deliver the shares for settlement.

11. BTIG earned approximately ***$1.6 million*** in commissions from placing mismarked sale orders for the Hedge Fund. From March through July 2017, the Hedge Fund generated the highest revenue of all BTIG's prime brokerage customers.[1]

12. By engaging in the misconduct described herein, BTIG violated, and unless restrained or enjoined by this Court, will continue to violate Rules 200(g) and 203(b)(1) of Regulation SHO under the Exchange Act. The SEC therefore seeks a judgment against BTIG providing permanent injunctive relief and ordering BTIG to pay disgorgement, plus prejudgment interest, and civil money penalties, as well as other appropriate and necessary equitable relief.

---

[1] "Prime brokerage" refers to a bundled package of services offered by investment banks and other major financial institutions to hedge funds and similar customers. The services provided within a prime brokerage bundle include securities lending, leveraged trade execution, and cash management, among other things.

## JURISDICTION AND VENUE

13. The SEC brings this action, and this Court has jurisdiction, pursuant to Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa(a)], and 28 U.S.C. § 1331.

14. Venue is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain acts, practices, transactions, and courses of business constituting the violations occurred in the Southern District of New York. BTIG has offices in New York, New York, and much of the misconduct discussed herein was carried out by personnel resident in BTIG's New York offices.

15. BTIG, directly or indirectly, made use of the means or instrumentalities of interstate commerce or the mails, or a facility of a national securities exchange, in connection with the conduct alleged herein.

## DEFENDANT

16. **BTIG, LLC** ("BTIG") is a broker-dealer registered with the SEC, headquartered in San Francisco, California, with offices in New York, New York. During the Relevant Period, the Hedge Fund had accounts at BTIG.

## OTHER RELEVANT ENTITIES

17. **The Hedge Fund** is a hedge fund "company limited by shares" organized under the laws of Bermuda and headquartered in Toronto, Canada. The Hedge Fund is not registered with the SEC as an investment company, and instead relies on the exclusion from the definition of investment company under Section 3(c)(1) of the Investment Company Act of 1940 for entities: (i) whose outstanding securities are beneficially owned by not more than 100 persons; and (ii) that do not make or presently propose to make a public offering of securities. As of

December 2016, the Hedge Fund had gross assets of over $750 million and 55 beneficial owners. The Hedge Fund has several subsidiaries, several of which entered into securities purchase agreements with the Issuers. The Hedge Fund and its subsidiaries are referred to herein collectively as the "Hedge Fund."

18. **Issuer 1** (together with Issuer 2, "the Issuers") is a corporation organized under the laws of the Republic of the Marshall Islands, with its principal place of business in Athens, Greece. During the Relevant Period, Issuer 1 was registered with the SEC pursuant to Section 12(b) of the Exchange Act, and Issuer 1's common stock traded on the Nasdaq Stock Market LLC. As a foreign private issuer, Issuer 1 filed periodic reports, including Forms 20-F, with the SEC pursuant to Section 13(a) of the Exchange Act and related rules thereunder. During the Relevant Period, Issuer 1 entered into several securities purchase agreements with the Hedge Fund. In October 2019, after the period at issue in this Complaint, Issuer 1 went private.

19. **Issuer 2** (together with Issuer 1, "the Issuers") is a corporation organized under the laws of the Republic of the Marshall Islands, with its principal place of business in Athens, Greece. Issuer 2 is registered with the Commission pursuant to Section 12(b) of the Exchange Act, and its common stock trades on the Nasdaq Stock Market LLC. As a foreign private issuer, Issuer 2 files periodic reports, including Forms 20-F, with the SEC pursuant to Section 13(a) of the Exchange Act and related rules thereunder. Issuer 2 entered into a securities purchase agreement with the Hedge Fund on March 22, 2017.

## TERMINOLOGY USED IN THIS COMPLAINT

### *Regulation SHO*

20. Regulation SHO is a set of rules from the SEC, implemented in 2005, that governs short selling practices. Regulation SHO established "locate" and "close-out" requirements aimed at curtailing naked short selling, failures to deliver, and other practices.

21. Rule 200(g) of Regulation SHO requires broker-dealers to mark all sale orders of equity securities as "long," "short," or "short exempt." 17 C.F.R. § 242.200(g).

22. Before effecting a short sale, Rule 203(b)(1) of Regulation SHO requires a broker-dealer to "locate" the securities being sold; *i.e.*, the broker-dealer must: (i) borrow the securities; (ii) enter into a bona fide arrangement to borrow the securities; or (iii) have reasonable grounds to believe that the securities can be borrowed so that they can be delivered on the date delivery is due. *See* 17 C.F.R. § 242.203(b)(1). The source of the "locate" must be documented. *See id.* Broker-dealers usually charge customers a fee for borrowing securities.

### *Short Selling*

23. "Short selling" occurs when an investor borrows a security and sells it on the open market, planning to buy it back later for less money.

24. Short sellers bet on, and profit from, a drop in a security's price. This can be contrasted with "long" investors, who want the security's price to go up.

25. Short selling has a high risk/reward ratio: It can offer big profits, but losses can mount quickly and infinitely, since the price of a security can always increase.

26. If an order cannot be marked as either "long" or "short exempt," it must be marked as a "short" sale.

***Naked Short Selling***

27. "Naked short selling" is the unlawful practice of short selling shares that have not been borrowed or located.

28. Ordinarily, traders must borrow a stock or determine that it can be borrowed before they sell it short. If sellers are engaged in "naked short sales," the volume of stock sold may be larger than the tradeable shares in the market and can result in failures to deliver.

***Long Selling***

29. "Long selling" is the opposite of "short selling," and occurs when an investor owns (rather than borrows) a security and sells it on the open market.

30. "Long"—or "long position"—refers to the purchase of an asset with the expectation that it will increase in value.

31. Under Regulation SHO, an order to sell may be marked "long" only if two conditions are met. *First*, the seller must be "deemed to own" the security pursuant to Rule 200(a) through (f) of Regulation SHO. 17 C.F.R. §§ 242.200(a)-(f), 242.200(g)(1). A seller is deemed to own a security only to the extent that it has a net long position in a security. 17 C.F.R. § 242.200(c). *Second*, to mark a sale "long," the broker-dealer must either: (i) have possession or control of the security to be delivered; or (ii) reasonably expect that the security will be in its physical possession or control no later than the settlement of the transaction. 17 C.F.R. § 242.200(g)(1). "Requiring a broker-dealer to have possession or control of the securities before it can mark an order long assists in mitigating settlement and credit risks that can affect the stability and integrity of the financial system as a whole." *Short Sales*, Exch. Act Rel. No. 34-50103 (Sept. 7, 2004).

***Deemed to Own***

32. Under Regulation SHO, a seller is "deemed to own" a security ***only*** if it has a net long position in a security. 17 C.F.R. § 242.200(c).

33. A seller may be deemed to own a security: (i) if the person ***purchased***, or has entered into an ***unconditional contract***, binding on both parties thereto, to purchase stock, but has not yet received it, ***or*** (ii) the person ***owns*** a security convertible into or exchangeable for stock ***and has tendered*** such security for conversion or exchange. 17 C.F.R. § 242.200(a)-(f).

***Settlement Date***

34. The "settlement date" is the date that a securities trade is finalized. The settlement date is the date on which the securities buyer must make payment to the seller, and the date on which the seller must deliver shares to the buyer.

35. During the Relevant Period, the settlement date for stocks was three days after the trade date, referred to as "T+3."

***Failure to Deliver***

36. Regulation SHO was designed, in part, to reduce "failures to deliver," which occur when a seller fails to deliver securities that it has sold by the settlement date. *See Short Sales*, Exch. Act Rel. No. 34-50103 (Jul. 28, 2004); *Amendments to Regulation SHO*, Exch. Act Rel. No. 34-60388 at 6, 9 (Jul. 27, 2009).

37. Failures to deliver may have negative effects on the markets and shareholders. For example, "sellers that fail to deliver securities on settlement date may attempt to use this additional freedom to engage in trading activities to improperly depress the price of a security. By not borrowing securities, and, therefore, not making delivery within the standard three-day

settlement period, the seller has additional freedom because it does not incur the costs of borrowing." *Amendments to Regulation SHO*, Exch. Act Rel. No. 34-60388 at 6-7.

***Borrow and Locate***

38. Prior to effecting a short sale, a broker-dealer must "locate" the securities being sold; *i.e.*, it must (i) borrow the securities, (ii) enter into a bona fide arrangement to borrow the securities, or (iii) have reasonable grounds to believe that the securities can be borrowed so that they can be delivered on the date delivery is due. *See* 17 C.F.R. § 242.203(b)(1). The source of the "locate" must be documented. *See id.* Broker-dealers usually charge customers a fee for borrowing securities.

***Clearing Broker***

39. Clearing brokers are liaisons between investors and clearing corporations. The key job of clearing brokers is to ensure the securities market runs smoothly and efficiently. Clearing brokers handle buy and sell orders, but also maintain custody of account owners' securities and other assets.

***Close Out and Buy In***

40. If a clearing broker incurs a failure to deliver position resulting from a short sale, then it must "immediately close out its fail-to-deliver position by borrowing or purchasing securities of like kind and quantity" by the beginning of regular trade hours on the first business day after settlement day (*i.e.*, T+4 during the Relevant Period). 17 C.F.R. § 204(a). This is commonly referred to as a "buy in." Clearing firms have two additional business days to effect close outs on long sales (*i.e.*, T+6 during the Relevant Period). 17 C.F.R. § 242.204(a)(1).

***Circuit Breaker Rule***

41. Regulation SHO's "Circuit Breaker Rule" (also referred to as the "alternative uptick rule"), is designed to "prevent short selling, including potentially manipulative or abusive short selling, from driving down further the price of a security that has already experienced a significant intraday price decline" and to "facilitate the ability of long sellers to sell first upon such a decline." *Amendments to Regulation SHO*, Exch. Act Rel. No. 34-61595 at 1-2 (May 10, 2010). The rule restricts the price at which a stock can be sold short after the stock has experienced a price decline of at least 10 percent from the prior day's close. 17 C.F.R. § 242.201.

***Short Exempt***

42. Regulation SHO contains a small number of narrow exceptions to the Circuit Breaker Rule. These narrow exceptions are intended to enable broker-dealers to best serve their customers in volatile markets.

43. "Short Exempt" refers to a short sale order exempted from the Circuit Breaker Rule, as governed by Regulation SHO.

44. When the Circuit Breaker has been triggered, an order may be marked "short exempt" if the seller is "deemed to own" the security, "provided that the person intends to deliver the security as soon as all restrictions on delivery have been removed." 17 C.F.R. § 242.201(d)(1). "Such circumstances could include the situation where a convertible security, option, or warrant has been tendered for conversion or exchange, but the underlying security is not reasonably expected to be received by settlement date." *Amendments to Regulation SHO*, Exch. Act Rel. No. 34-60388 at n. 141 (Jul. 31, 2009).

45. Clearing firms have 35 calendar days following the trade date to close out fails to deliver resulting from short exempt sales. 17 C.F.R. § 242.204(a)(2).

***Convertible Agreement***

46. A "Convertible Agreement" is an agreement under which an investor purchases convertible securities from an issuer. The holder of the convertible securities has the right to convert the convertible securities into shares of the issuer's common stock at a price determined by an agreed-upon formula.

47. Convertible Agreements are a form of company financing. Convertible Agreements have the advantage of being fairly simple to execute. This means that the process of issuing the convertible securities is relatively inexpensive for companies and it allows them quicker access to investor funding.

***Equity Line of Credit***

48. An "Equity Line of Credit," or "ELOC," is an agreement under which an investor agrees to purchase up to a certain dollar amount of an issuer's common stock. Under an ELOC, the issuer has the right, per the terms and conditions of the agreement, to "draw down" on the line by requiring the investor to purchase a specified dollar amount of its stock, the price of which is determined by an agreed-upon formula.

***Tender***

49. "Tender" refers to the holder of a convertible security exercising its right to convert the security.

***Conversion***

50. "Conversion" refers to the process of converting a convertible security into shares of common stock, following a tender.

# FACTUAL ALLEGATIONS

## I. OVERVIEW

***Summary of BTIG's Misconduct***

51. During the Relevant Period, BTIG mismarked ***over 96 percent*** of the Hedge Fund's sales of the Issuers' stock. All told, BTIG mismarked ***over 90*** sale orders of nearly ***160 million*** shares of stock, totaling more than ***$250 million***, as "long" (and in a few instances, "short exempt"), even though at the time of the orders, the Hedge Fund was, in fact, short. Put another way, due to BTIG's order mismarking, the Hedge Fund was able to sell securities short even though the Hedge Fund ***already*** had a short position in the security and did not borrow or locate any additional shares to sell short.

52. BTIG mismarked over ***96 percent*** of the sale orders placed by the Hedge Fund in Issuer 1's stock. Out of a total of ***91*** sale orders placed in Issuer 1's stock with BTIG, BTIG mismarked ***88*** sale orders (mismarking 86 sale orders as "long," and two sale orders as "short exempt"). All 88 of these sale orders should have been marked "short," because—at the time of the sales—the Hedge Fund and Issuer 1 had not entered into an unconditional contract, and the Hedge Fund did not have a net long position in Issuer 1's common stock.

53. These sale orders should have been marked "short" on another, independent ground: At the time of the sale orders, BTIG did not have the shares in its possession—and did not reasonably expect to have the shares in its possession—by the settlement date.

54. BTIG also mismarked ***100 percent*** of the sale orders placed by the Hedge Fund in Issuer 2's stock, mismarking four out of four sales as "short exempt." All four of these sale orders should have been marked "short," because—at the time of the sales—the Hedge Fund did not have a net long position in Issuer 2's stock.

55. Despite the fact that these "long" and "short exempt" sale orders should have been marked as "short," BTIG did not borrow or locate the securities sold.

***The Hedge Fund's Investment Strategy, Securities Purchase Agreements, and Sales of Stock Through BTIG***

56. In 2016 and 2017, the Hedge Fund entered into a series of securities purchase agreements with Issuer 1 and Issuer 2. The Hedge Fund entered into two types of securities purchase agreements with the Issuers: (i) Convertible Agreements; and (ii) Equity Lines of Credit ("ELOCs").

57. The Hedge Fund's sales under the Convertible Agreements:

a. The Hedge Fund entered into Convertible Agreements with both Issuer 1 and Issuer 2, under which the Hedge Fund purchased preferred stock that was convertible into shares of common stock.

b. Under Regulation SHO, the Hedge Fund was deemed to own common stock under these Convertible Agreements only upon "tendering" the convertible securities to the issuer for conversion. 17 C.F.R. § 242.200(b)(3).

c. The Hedge Fund tendered its convertible securities for conversion by emailing conversion notices to the Issuers, which specified the date of conversion, the number of shares of preferred stock to be converted, the conversion price, and the number of shares of common stock to be issued.

d. The Hedge Fund generally sold shares of common stock ***before*** tendering its preferred convertible stock for conversion. The Hedge Fund therefore was short the stock being sold.

58. The Hedge Fund's sales under the ELOCs:

a. The Hedge Fund entered into ELOCs with Issuer 1, under which the Hedge Fund agreed to purchase up to a certain dollar amount of Issuer 1's common stock ***if*** certain conditions were met.

b. If certain conditions were ***not*** met—for example, if the daily volume weighted average price ("VWAP") did not equal or exceed the floor price for at least one trading day during the pricing period—then the ELOCs provided that the Hedge Fund was ***not*** obligated to purchase shares under the fixed request notice.

c. If other conditions were ***not*** met—for example, if Issuer 1's stock was not actively traded because the SEC or Nasdaq suspended trading—Issuer 1 was ***not*** obligated to issue and sell the shares to the Hedge Fund.

d. Under the ELOCs, Issuer 1 delivered fixed request notices to the Hedge Fund, each of which identified a specified dollar amount of stock purportedly to be purchased by the Hedge Fund (the "fixed amount requested"), a "pricing period" to set the purchase price, and a "floor price" for the purchase price per share.

e. The purchase price was defined as a discount to VWAP during the pricing period that equaled or exceeded the floor price. At the end of the pricing period, the Hedge Fund sent a confirmation notice to Issuer 1, calculating the purchase price and the total number of shares to be purchased.

f. Under Regulation SHO, the Hedge Fund was deemed to own Issuer 1's common stock under the ELOCs when it ***purchased***, or entered into an ***unconditional contract***, binding on both parties, to purchase the shares. 17 C.F.R. § 242.200(b)(2).

g. The Hedge Fund "purchased" shares from Issuer 1 at the end of the pricing period for each fixed request notice, when it wired funds to Issuer 1.

h. The ELOCs and fixed request notices were not unconditional contracts, because: (i) they included conditions that—if not satisfied—obviated the Hedge Fund's obligation to purchase and/or Issuer 1's obligation to sell; and (ii) in practice, the Hedge Fund and Issuer 1 routinely agreed to disregard the fixed amount requested in the fixed request notices, and instead matched ***exactly*** the number of shares provided to the Hedge Fund after each pricing period to the number of shares sold by the Hedge Fund during the pricing period.

59. Under Regulation SHO, for stock sold under both the Convertible Agreements and the ELOCs, the Hedge Fund was deemed to own the Issuers' common stock "only to the extent that [it] ha[d] a long position in such securities." 17 C.F.R. § 242.200(c).

60. The Hedge Fund purchased hundreds of millions of dollars of the Issuers' stock under the Convertible Agreements and ELOCs. The Hedge Fund sold more than ***$250 million*** of that stock through orders placed with BTIG, generating commissions for BTIG of over ***$1.6 million***.

61. In so doing, the Hedge Fund profited from the difference between the market price and the discounted price at which it later purchased the stock from Issuer 1 and Issuer 2.

## II. BTIG IMPROPERLY MARKED THE HEDGE FUND'S SALES OF STOCK AS "LONG" AND "SHORT EXEMPT"

### *BTIG Mismarked the Hedge Fund's Sales of Issuer 1's Stock as "Long" and "Short Exempt"*

62. During the Relevant Period, BTIG mismarked a total of 88 of 91 sales (96.7 percent) of Issuer 1's stock by the Hedge Fund as "long" or "short exempt," as detailed in the table below:

| SUMMARY OF BTIG'S MISMARKING OF THE HEDGE FUND'S TRADES IN ISSUER 1'S STOCK | | | | | |
|---|---|---|---|---|---|
| | **Trade Date** | **Number of Shares Sold** | **Dollar Value of Shares Sold** | **BTIG's Mismarking** | **Correct Order Marking** |
| 1. | 12/27/2016 | 1,100,000 | $4,443,965 | Long | Short |
| 2. | 1/13/2017 | 6,500,000 | $12,948,306 | Long | Short |
| 3. | 3/6/2017 | 6,144,750 | $8,039,779 | Long | Short |
| 4. | 3/7/2017 | 6,150,545 | $8,047,533 | Long | Short |
| 5. | 3/8/2017 | 4,506,267 | $6,339,299 | Long | Short |
| 6. | 3/8/2017 | 31,181 | $46,460 | Long | Short |
| 7. | 3/9/2017 | 7,022,407 | $12,366,037 | Long | Short |
| 8. | 3/9/2017 | 1,130,000 | $2,053,187 | Long | Short |
| 9. | 3/10/2017 | 8,000,000 | $15,668,120 | Long | Short |
| 10. | 3/10/2017 | 2,000,000 | $3,437,200 | Long | Short |
| 11. | 3/13/2017 | 1,212,279 | $2,183,833 | Long | Short |
| 12. | 3/14/2017 | 2,486,699 | $4,334,065 | Long | Short |
| 13. | 3/15/2017 | 1,791,147 | $3,085,718 | Long | Short |
| 14. | 3/16/2017 | 427,797 | $728,664 | Long | Short |
| 15. | 3/16/2017 | 71,000 | $127,979 | Short Exempt | Short |
| 16. | 3/17/2017 | 1,100,000 | $1,875,357 | Short Exempt | Short |
| 17. | 4/3/2017 | 11,074,374 | $14,909,419 | Long | Short |
| 18. | 4/4/2017 | 8,593,418 | $10,693,400 | Long | Short |
| 19. | 4/5/2017 | 10,188,845 | $11,065,758 | Long | Short |
| 20. | 4/6/2017 | 2,248,766 | $2,175,299 | Long | Short |
| 21. | 4/7/2017 | 3,882,966 | $2,895,671 | Long | Short |
| 22. | 4/10/2017 | 3,189,728 | $1,952,216 | Long | Short |
| 23. | 4/11/2017 | 2,034,017 | $3,807,051 | Long | Short |
| 24. | 4/11/2017 | 178,000 | $334,987 | Long | Short |
| 25. | 4/12/2017 | 2,655,213 | $4,838,435 | Long | Short |
| 26. | 4/12/2017 | 299,615 | $654,134 | Long | Short |

| SUMMARY OF BTIG'S MISMARKING OF THE HEDGE FUND'S TRADES IN ISSUER 1'S STOCK | | | | | |
|---|---|---|---|---|---|
| | **Trade Date** | **Number of Shares Sold** | **Dollar Value of Shares Sold** | **BTIG's Mismarking** | **Correct Order Marking** |
| 27. | 4/13/2017 | 1,235,905 | $2,692,878 | Long | Short |
| 28. | 4/17/2017 | 712,267 | $1,341,428 | Long | Short |
| 29. | 4/18/2017 | 1,058,962 | $1,881,577 | Long | Short |
| 30. | 4/19/2017 | 1,034,248 | $1,829,047 | Long | Short |
| 31. | 4/20/2017 | 475,211 | $823,530 | Long | Short |
| 32. | 4/21/2017 | 1,198,000 | $1,909,971 | Long | Short |
| 33. | 4/24/2017 | 1,661,023 | $2,264,119 | Long | Short |
| 34. | 4/25/2017 | 1,427,874 | $1,979,278 | Long | Short |
| 35. | 4/26/2017 | 1,203,871 | $1,549,325 | Long | Short |
| 36. | 4/27/2017 | 1,681,995 | $2,180,802 | Long | Short |
| 37. | 4/28/2017 | 684,074 | $907,822 | Long | Short |
| 38. | 5/1/2017 | 1,131,600 | $1,292,181 | Long | Short |
| 39. | 5/2/2017 | 705,809 | $756,984 | Long | Short |
| 40. | 5/3/2017 | 215,863 | $147,765 | Long | Short |
| 41. | 5/12/2017 | 570,029 | $2,879,134 | Long | Short |
| 42. | 5/15/2017 | 337,432 | $1,545,172 | Long | Short |
| 43. | 5/16/2017 | 260,340 | $1,067,885 | Long | Short |
| 44. | 5/17/2017 | 650,213 | $2,677,258 | Long | Short |
| 45. | 5/18/2017 | 365,451 | $1,571,030 | Long | Short |
| 46. | 5/19/2017 | 251,790 | $1,073,308 | Long | Short |
| 47. | 5/22/2017 | 419,725 | $1,494,314 | Long | Short |
| 48. | 5/23/2017 | 341,434 | $1,104,154 | Long | Short |
| 49. | 5/24/2017 | 246,240 | $752,812 | Long | Short |
| 50. | 5/25/2017 | 449,574 | $1,409,182 | Long | Short |
| 51. | 5/26/2017 | 257,170 | $747,176 | Long | Short |
| 52. | 5/30/2017 | 690,625 | $1,875,822 | Long | Short |
| 53. | 5/31/2017 | 236,926 | $593,305 | Long | Short |
| 54. | 6/1/2017 | 712,181 | $1,788,801 | Long | Short |
| 55. | 6/2/2017 | 381,425 | $902,800 | Long | Short |
| 56. | 6/5/2017 | 932,003 | $1,871,432 | Long | Short |
| 57. | 6/6/2017 | 1,343,584 | $2,680,081 | Long | Short |
| 58. | 6/6/2017 | 16,864 | $35,752 | Long | Short |
| 59. | 6/7/2017 | 906,054 | $1,722,443 | Long | Short |
| 60. | 6/8/2017 | 1,015,380 | $1,969,502 | Long | Short |
| 61. | 6/9/2017 | 552,946 | $1,074,787 | Long | Short |
| 62. | 6/12/2017 | 367,774 | $711,055 | Long | Short |
| 63. | 6/13/2017 | 2,500,000 | $5,085,220 | Long | Short |

| SUMMARY OF BTIG'S MISMARKING OF THE HEDGE FUND'S TRADES IN ISSUER 1'S STOCK | | | | | |
|---|---|---|---|---|---|
| | **Trade Date** | **Number of Shares Sold** | **Dollar Value of Shares Sold** | **BTIG's Mismarking** | **Correct Order Marking** |
| 64. | 6/14/2017 | 1,349,876 | $2,512,493 | Long | Short |
| 65. | 6/15/2017 | 600,000 | $1,023,467 | Long | Short |
| 66. | 6/16/2017 | 377,400 | $648,480 | Long | Short |
| 67. | 6/19/2017 | 2,308,000 | $2,866,111 | Long | Short |
| 68. | 6/20/2017 | 1,380,000 | $1,436,584 | Long | Short |
| 69. | 6/20/2017 | 780 | $796 | Long | Short |
| 70. | 6/21/2017 | 554,603 | $507,678 | Long | Short |
| 71. | 6/22/2017 | 1,421,969 | $4,532,469 | Long | Short |
| 72. | 6/22/2017 | 29,082 | $83,175 | Long | Short |
| 73. | 6/23/2017 | 1,568,821 | $4,020,827 | Long | Short |
| 74. | 6/26/2017 | 466,518 | $1,050,899 | Long | Short |
| 75. | 6/27/2017 | 1,756,188 | $4,544,934 | Long | Short |
| 76. | 6/27/2017 | 7,576 | $19,723 | Long | Short |
| 77. | 6/28/2017 | 2,619,730 | $5,514,338 | Long | Short |
| 78. | 6/29/2017 | 894,935 | $1,560,102 | Long | Short |
| 79. | 6/30/2017 | 1,328,635 | $1,985,563 | Long | Short |
| 80. | 7/3/2017 | 1,125,000 | $1,209,607 | Long | Short |
| 81. | 7/5/2017 | 6,000,000 | $7,183,458 | Long | Short |
| 82. | 7/6/2017 | 2,000,000 | $2,202,536 | Long | Short |
| 83. | 7/7/2017 | 1,288,514 | $1,394,463 | Long | Short |
| 84. | 7/10/2017 | 1,277,873 | $1,193,884 | Long | Short |
| 85. | 7/11/2017 | 1,899,902 | $1,824,242 | Long | Short |
| 86. | 7/12/2017 | 1,612,113 | $1,543,134 | Long | Short |
| 87. | 7/13/2017 | 1,650,000 | $1,584,629 | Long | Short |
| 88. | 7/14/2017 | 2,650,000 | $2,664,458 | Long | Short |

63. The Hedge Fund was not deemed to own shares sufficient to cover these sale orders in Issuer 1's stock and therefore did not have a net long position in the securities.

64. Specifically, the Hedge Fund was not deemed to own the shares of Issuer 1's stock at the time it sold that stock, because it had not purchased, or entered into an unconditional contract to purchase, the stock being sold.

65. All of the Hedge Fund's sales of Issuer 1's stock executed by BTIG were under the ELOCs. The ELOCs contained numerous conditions. Further, in practice, because the Hedge Fund and Issuer 1 frequently disregarded the fixed request notices, and the Hedge Fund generally purchased the ***exact*** number of shares of Issuer 1's stock that it had sold during the pricing period, the number and price of shares to be purchased was conditioned on the Hedge Fund's sales during the pricing period. At the time of the sales, the Hedge Fund did not have a net long position in the stock being sold.

66. BTIG knew that the Hedge Fund did not have sufficient shares of Issuer 1's stock in its account to cover its sales.

67. BTIG did not ask the Hedge Fund to provide documentation showing that it was deemed to own the shares of Issuer 1's stock sold.

68. BTIG did not verify that the Hedge Fund was deemed to own the shares of Issuer 1's stock sold, despite repeated failures to deliver and other red flags.

69. BTIG did not borrow or locate shares in connection with its 88 mismarked sales of Issuer 1's stock on behalf of the Hedge Fund.

***BTIG Mismarked the Hedge Fund's Sales of Issuer 2's Stock as "Short Exempt"***

70. During the Relevant Period, BTIG mismarked four out of four sales (100 percent)[2] of Issuer 2's stock by the Hedge Fund as "short exempt," as detailed in the table below:

[2] For purposes of this calculation, we have excluded two trades in Issuer 2's stock executed by BTIG for the Hedge Fund: (i) a BTIG trade error; and (ii) a sale order that was marked long after buy ins to close out the Hedge Fund's failures to deliver.

| SUMMARY OF BTIG'S MISMARKING OF THE HEDGE FUND'S TRADES IN ISSUER 2'S STOCK | | | | | |
|---|---|---|---|---|---|
| | **Trade Date** | **Number of Shares Sold** | **Dollar Value of Shares Sold** | **BTIG's Mismarking** | **Correct Order Marking** |
| 1. | 3/22/2017 | 250,000 | $412,823 | Short Exempt | Short |
| 2. | 3/23/2017 | 331,503 | $558,080 | Short Exempt | Short |
| 3. | 3/24/2017 | 279,774 | $439,275 | Short Exempt | Short |
| 4. | 3/27/2017 | 241,399 | $344,265 | Short Exempt | Short |

71. On March 22, 2017, in an apparent attempt to enable the Hedge Fund to sell Issuer 2's stock short, BTIG attempted to locate shares of Issuer 2's stock.

72. BTIG submitted a locate request to its clearing broker. The clearing broker rejected BTIG's locate request, because the clearing broker could not locate the shares. Issuer 2's stock was generally hard to borrow during the Relevant Period, meaning that there was limited supply of stock for short selling and the costs of borrowing the stock were generally higher.

73. Unable to locate shares of Issuer 2's stock, BTIG mismarked the Hedge Fund's sale orders of Issuer 2's stock as "short exempt."

74. Between March 22 and 27, 2017, BTIG executed a total of four sales of Issuer 2's stock for the Hedge Fund. BTIG mismarked each of these sale orders as "short exempt."

75. BTIG's marking of the Hedge Fund's sale orders of Issuer 2's stock as "short exempt" was improper, because the Hedge Fund was not deemed to own sufficient shares of Issuer 2's stock to cover the sales. In addition, for at least one of these sale orders, BTIG's marking as short exempt was improper because the Circuit Breaker was not in effect.

76. To be deemed to own the stock, the Hedge Fund would have had to tender sufficient shares of its preferred convertible stock for conversion to Issuer 2.

77. The Hedge Fund did not do so. The Hedge Fund first tendered its preferred convertible stock to Issuer 2 for conversion into shares of Issuer 2's common stock on March 28, 2017, ***after*** it had placed ***all four*** trade orders. This resulted in failures to deliver by the Hedge Fund on March 27 and March 30.

78. BTIG knew that the Hedge Fund did not have sufficient shares in its account to cover the sales.

79. BTIG did not ask the Hedge Fund to provide documentation showing that it was deemed to own the shares of stock sold.

80. After BTIG requested that the clearing firm extend delivery to T+35, the clearing firm asked for documentation that the Hedge Fund was deemed to own the stock that it was selling. BTIG belatedly attempted to obtain such documentation, but was unable to do so.

81. Because BTIG could not provide documentation that the Hedge Fund owned the shares of Issuer 2's stock when it sold them on March 22, 2017, the clearing broker refused to extend the settlement date. The clearing broker executed a "buy in"—buying shares of Issuer 2's common stock in the market—to close out the trade.

82. On March 28, 2017, the day after the fourth incorrectly marked "short exempt" sale and the Hedge Fund's failure to timely deliver shares for settlement on March 27, a BTIG operations employee informed the Hedge Fund that: "Our top priority at the moment is the fixed request notice or other form of proof of purchase of the [Issuer 2] shares." The Hedge Fund employee replied: "All the notices were sent ***last night*** and we are waiting for signed back version." (emphasis added).

83. In other words, the Hedge Fund employee acknowledged that—at the time the Hedge Fund's sales of Issuer 2's stock were marked "short exempt"—the Hedge Fund had not even tendered its preferred shares for conversion. BTIG ignored this red flag.

84. On March 30, 2017, the Hedge Fund again failed to deliver shares of Issuer 2's common stock by the settlement date. BTIG again attempted, ***after*** mismarking the sale as "short exempt," to obtain proof that the Hedge Fund was deemed to own the shares that it already had sold on March 27 and had failed to deliver.

85. On March 30, 2017, a BTIG operations employee asked a Hedge Fund employee to send BTIG a conversion notice, evidencing that the Hedge Fund had tendered its preferred stock for conversion to common stock ***before*** BTIG marked the March 27 sale order as "short exempt."

86. The Hedge Fund did not provide BTIG with the requested conversion notice, but instead provided BTIG with a conversion notice dated ***March 28***.

87. Unable to obtain legitimate documentation of the Hedge Fund's ownership of Issuer 2's common stock to provide to the clearing broker, BTIG attempted to obtain an after-the-fact email from the Hedge Fund.

88. On March 30, 2017, at the instruction of BTIG's compliance department, a BTIG trader messaged the Hedge Fund's principal, stating, "Confirming that on March 27th, I instructed my settlement team to engage into the conversion o[f] [Issuer 2's stock] prior to giving the order to BTIG . . . is that something you can send us or no . . . can you send that in an email?" The Hedge Fund's principal responded by copying this language, word-for-word (including a typographical error), into an email to BTIG.

89. The clearing broker did not accept this email as sufficient proof that the Hedge Fund was deemed to own the shares of Issuer 2's stock that it sold on March 27, 2017, and, again, refused to extend the settlement date. The clearing broker executed a "buy-in" to settle the trade on March 31, 2017, because BTIG did not deliver the shares from its customer in a timely manner.

90. BTIG did not borrow or locate shares in connection with its four mismarked sales of Issuer 2's stock on behalf of the Hedge Fund.

## III. BTIG DID NOT TAKE REASONABLE STEPS TO VERIFY THAT THE HEDGE FUND WOULD DELIVER SHARES OF STOCK SOLD BY SETTLEMENT AND IGNORED RED FLAGS

91. BTIG did not take reasonable steps to verify that the Hedge Fund would deliver shares of stock sold by the settlement date, and it was not reasonable for BTIG to expect that the Hedge Fund would deliver shares of stock sold by the settlement date. BTIG continued to mismark the Hedge Fund's sales of the Issuers' stock as "long" and "short exempt" even after encountering numerous red flags.

92. These red flags included, but were not limited to: (i) BTIG's own history with the Hedge Fund; (ii) the refusal of BTIG's clearing broker to continue to clear the Hedge Fund's trades; (iii) the Hedge Fund's repeated failures to deliver shares of stock sold by the settlement date; (iv) negative account balances that triggered BTIG's internal accounting system's controls; and (v) the manner in which the Hedge Fund paid for its stock purchases.

93. Individually and collectively, these red flags should have caused BTIG to verify that the Hedge Fund was, in fact, long before placing additional sales on behalf of the Hedge Fund. BTIG did not do so.

94. BTIG did not verify the Hedge Fund's assertions that it was "deemed to own" sufficient shares of the Issuers' stock to cover its sales. BTIG did not take reasonable steps to verify assertions by the Hedge Fund that it would deliver the shares of stock sold by the settlement date. It was not reasonable for BTIG to expect that the Hedge Fund would deliver shares of stock sold by the settlement date.

***BTIG Ignored Its Own History with the Hedge Fund and the Types of Transactions at Issue***

95. In April 2015, BTIG and the Hedge Fund's former clearing broker were concerned about the Hedge Fund's large sales of certain low-priced securities received under convertible securities agreements. Namely, BTIG and the Hedge Fund's former clearing broker were concerned that the Hedge Fund might have engaged in market manipulation and the sale of unregistered securities.

96. As a result of these concerns, BTIG closed the Hedge Fund's account.

97. Following BTIG's closure of the Hedge Fund's account, a BTIG registered representative repeatedly pressed his superiors to re-open the Hedge Fund's account, emphasizing his personal friendship with the Hedge Fund's principal, and that the Hedge Fund would be a $500,000 to $1 million dollar account.

98. In December 2016, BTIG permitted the Hedge Fund to open a new account.

99. BTIG's registered representative also persuaded BTIG to open a prime brokerage account for the Hedge Fund, arguing that without such an account, BTIG was missing out on large commissions from the Hedge Fund's sales of Issuer 1's stock received under the ELOCs.

100. The BTIG registered representative urged BTIG management to expedite the opening of a prime brokerage account for the Hedge Fund in March 2017, writing, "I know I am asking for a lot but the Juice is worth the squeeze." The BTIG registered representative also

emailed BTIG's operations group, pressing them to open the account quickly and stating, "Missed 200gs [$200,000] yesterday. ***We need to focus only on this***." (emphasis added).

***BTIG Ignored Its Clearing Broker's Refusal to Do Business With the Hedge Fund***

101. Due to compliance concerns, the Hedge Fund's former clearing broker informed BTIG that it would no longer clear the Hedge Fund's trades.

102. BTIG made special arrangements for the Hedge Fund's account to be cleared by a new clearing broker.

***BTIG Ignored the Hedge Fund's Failures to Deliver***

103. Less than two weeks after BTIG opened a new account for the Hedge Fund in December 2016, BTIG and the Hedge Fund began discussing the Hedge Fund's anticipated sales of Issuer 1's stock.

104. The Hedge Fund told BTIG that it expected to receive shares of Issuer 1's stock under an ELOC with Issuer 1, and to place sale orders for those shares through BTIG.

105. BTIG's registered representative told colleagues at BTIG that he did not expect the Hedge Fund to deliver the shares of Issuer 1's stock that the Hedge Fund would receive under the ELOCs by the settlement date (T+3), and instead expected the Hedge Fund to deliver these shares ***eight days*** after the trade date (T+8).

106. BTIG did not take steps to ensure that this and similar trades would be correctly marked as "short." Rather, BTIG informed its new clearing broker that it had a customer who would be selling "short exempt," who would likely need to apply for an extension of the period to deliver shares. At the time of this representation to the clearing broker, BTIG knew or should have known that the Hedge Fund did not meet the qualifications to sell short exempt.

107. On January 13, 2017, BTIG executed a "long" sale order of Issuer 1's stock on behalf of the Hedge Fund. The Hedge Fund failed to deliver shares to BTIG by the settlement date. Despite this failure to deliver, a little over two weeks later, on January 31, 2017, BTIG executed another purportedly "long" sale order of Issuer 1's stock for the Hedge Fund. There is no evidence for these trades that BTIG asked the Hedge Fund whether it possessed the shares of stock sold or whether the Hedge Fund intended to deliver shares by the settlement date. No one at BTIG consulted BTIG's compliance officer about these trades.

108. In February 2017, BTIG's registered representative made a half-hearted attempt to find out whether the Hedge Fund would be able to timely deliver shares by the settlement date, asking, "[T]he [Issuer 1] trades that may be done in the future. [D]o you expect them to be . . . t+3[?]" There is no record that the Hedge Fund responded.

109. Despite the Hedge Fund's failure to deliver shares of Issuer 1's stock received under the ELOCs for timely settlement, BTIG nevertheless continued to place sale orders of Issuer 1's stock on behalf of the Hedge Fund and to mismark these sale orders as "long."

110. Between March 2017 through mid-July 2017, BTIG executed sale orders of Issuer 1's stock on behalf of the Hedge Fund nearly daily. BTIG mismarked 84 of these sales as "long." Before marking these sales as "long," BTIG failed to verify that the Hedge Fund was deemed to own the shares of stock sold and failed to take reasonable steps to verify that the Hedge Fund would timely deliver shares for settlement.

111. On March 16, 2017, less than two weeks into trading Issuer 1's stock through its prime brokerage account at BTIG, the Hedge Fund failed to deliver shares by the settlement date.

112. After this failure to deliver, a BTIG compliance employee recognized that BTIG did not reasonably expect the Hedge Fund to timely deliver shares of Issuer 1's stock and

instructed the BTIG registered representative to mark the Hedge Fund's next sale orders of Issuer 1's stock as "short exempt."

113. These orders were incorrectly marked, because the Hedge Fund was not "deemed to own" the shares of stock sold at the time that BTIG placed the short exempt sale orders. Before marking these sales as "short exempt," BTIG also failed to determine that the Circuit Breaker was in effect, and that the Hedge Fund intended to deliver shares as soon as all restrictions were lifted.

### ***BTIG Circumvented Its Own Controls to Continue to Place Mismarked Sale Orders for the Hedge Fund***

114. Between March 2017 and July 2017, with a sole exception, the Hedge Fund did not have sufficient shares of Issuer 1's stock in its BTIG account to cover its purported "long" sales.

115. For example, on March 6, 2017—the date of the Hedge Fund's first sale of Issuer 1's stock through the Hedge Fund's BTIG prime brokerage account—the Hedge Fund had ***no*** shares of Issuer 1's stock in its BTIG account.

116. On subsequent trade dates, following BTIG's order mismarking and the Hedge Fund's failures to deliver, the Hedge Fund's account had a ***negative*** account balance in shares of Issuer 1's stock.

117. Because the Hedge Fund did not have sufficient shares in its account to cover its trades in Issuer 1's stock, BTIG's internal accounting system prevented further long sale orders. Instead of heeding its own system's warnings, BTIG manually changed the Hedge Fund's trades in BTIG's internal system from "long" to "short" ***after*** they were marked.

118. Several days after the trade date, the Hedge Fund generally would deposit shares of Issuer 1's stock that it received under the ELOCs into its BTIG brokerage account.

119. BTIG consistently used these shares of stock, which were not deposited until several days after the trade date, to settle the Hedge Fund's trades in Issuer 1's stock. This was contrary to BTIG's own policies and procedures. Specifically, the first page of the "Penny Stock Questionnaire" that BTIG filled out every time the Hedge Fund deposited shares of Issuer 1's stock into its account states, in bold, underlined, all capital letters: "**THESE SHARES MUST NOT BE TRADED UNTIL THE CLEARING FIRM HAS ACCEPTED THEM FOR DEPOSIT.**"

***BTIG Ignored Red Flags Presented by the Hedge Fund's Payment for Stock***

120. BTIG also ignored the red flags presented by the manner in which the Hedge Fund paid for stock. Specifically, the Hedge Fund often paid for the shares of Issuer 1's stock with the ***proceeds*** from the sale of that same stock.

121. BTIG employees, who processed the Hedge Fund's requests to wire money out of its account to pay Issuer 1 for the share it had already sold, were aware of this arrangement.

***New Agreements, Same Failures to Deliver***

122. Beginning on April 3, 2017, BTIG began executing the Hedge Fund's sales of Issuer 1's stock under a new ELOC.

123. BTIG mismarked these sales as "long," even though: (i) the Hedge Fund previously had repeatedly failed to deliver shares of Issuer 1's stock by the settlement date; and (ii) a BTIG compliance employee had determined—just two weeks before—that the sales should be marked "short exempt" due to likely delivery delays.

124. The BTIG compliance employee did not require the Hedge Fund to provide any documentation supporting its ability to deliver shares by the settlement date, before changing his decision to mark the Hedge Fund's trades from "short exempt," to "long."

125. On April 10, 2017, the Hedge Fund again failed to deliver shares of Issuer 1's stock by the settlement date. The Hedge Fund failed to timely deliver shares of Issuer 1's stock five more times in April 2017, once in May 2017, and three more times in June 2017.

126. Despite these repeated failures to deliver, BTIG continued to mark the Hedge Fund's sales of Issuer 1's stock as "long," and took no steps whatsoever to confirm that the sale orders were correctly marked.

127. In at least one instance, the Hedge Fund even marked a sale of Issuer 1's stock as "long" while it had an ***outstanding*** failure to deliver in connection with a prior purportedly "long" sale.

***BTIG Failed to Follow its Own Policies and Procedures Regarding Failures to Deliver***

128. BTIG's policies and procedures required it to monitor failures to deliver and to maintain a log of failures to deliver and the reasons for those failures.

129. BTIG did not follow these policies and procedures here.

130. BTIG did not log any of the Hedge Fund's failures to deliver or the reasons for those failures.

131. In most instances in which the Hedge Fund failed to timely deliver shares, BTIG did not request or obtain an explanation for the Hedge Fund's failure to deliver.

132. As a result, despite being aware of each of the Hedge Fund's failures to deliver, BTIG did not consider the repeated failures, or consistently obtain reasons for those failures, when deciding whether it was reasonable to rely on order marking representations from its customer.

## IV. BTIG DID NOT BORROW OR LOCATE SHARES

133. BTIG did not borrow or locate shares in connection with its mismarked the Hedge Fund's sales of the Issuers' stock on behalf of the Hedge Fund.

134. As detailed above, on over 90 occasions, BTIG mismarked short sales as "long" or "short exempt," but did not borrow the securities sold or enter into bona fide arrangements to borrow the securities.

135. BTIG did not have reasonable grounds to believe that the securities could be borrowed so that they could be delivered on the date delivery was due. BTIG undertook no inquiry, and the Issuers' stock was generally hard to borrow during the Relevant Period.

136. BTIG did not document its compliance with Rule 203(b)(1) of Regulation SHO.

## CLAIMS FOR RELIEF

### *Count I*

### Violation of Rule 200(g) of Regulation SHO

137. Paragraphs 1 through 136 are realleged and incorporated by reference.

138. By reason of the conduct described above, BTIG mismarked the Hedge Fund's sale orders of Issuer 1's common stock as "long" when (i) the Hedge Fund was not deemed to own the securities being sold pursuant to paragraphs (a) through (f) of Rule 200 of Regulation SHO; and (ii) the securities to be delivered were not in the physical possession or control of BTIG, and BTIG did not reasonably expect that the securities would be in its physical possession or control on or before the settlement of the transaction.

139. By reason of the conduct described above, BTIG mismarked the Hedge Fund's sale orders of the Issuers' stock as "short exempt" when (i) the Hedge Fund was not deemed to

own the securities being sold pursuant to paragraphs (a) through (f) of Rule 200 of Regulation SHO; and (ii) the provisions of Rule 201(c) or (d) of Regulation SHO were not otherwise met.

140. By reason of the foregoing, BTIG violated Rule 200(g) of Regulation SHO [17 C.F.R. § 242.200(g)].

***Count II***

**Violation of Rule 203(b)(1) of Regulation SHO**

141. Paragraphs 1 through 140 are realleged and incorporated by reference.

142. By reason of the conduct described above, on over 90 occasions during the Relevant Period, BTIG executed what were—in reality—"short" sale orders of the Issuer's stock on behalf of the Hedge Fund.

143. In each of these instances, BTIG did not borrow the securities or enter into a bona fide arrangement to borrow the securities. BTIG did not have reasonable grounds to believe that the securities could be borrowed, such that the securities could be delivered on the date delivery was due. BTIG did not document compliance with the borrow and locate requirements of Regulation SHO.

144. By reason of the foregoing, BTIG violated Rule 203(b)(1) of Regulation SHO [17 C.F.R. § 242.203(b)(1)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A. Finding that BTIG violated the federal securities laws and regulations alleged in this complaint;

B. Permanently restraining and enjoining BTIG from violating the federal securities laws and regulations alleged in this complaint;

C. Ordering BTIG to disgorge all ill-gotten gains received as a result of its unlawful conduct, plus prejudgment interest;

D. Ordering BTIG to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

E. Granting such other and further equitable relief to the SEC as the Court deems just and appropriate.

**JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC demands a jury trial on all the issues so triable.

Dated: May 19, 2021

Respectfully submitted,

Sarah Heaton Concannon
(SDNY Bar No. SC-9111)
Tel: (202) 551-5361
Fax: (804) 708-6125
ConcannonS@sec.gov

SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549

Of Counsel:
Kevin Guerrero
Michael J. Brennan
Emily E. Shea